**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **MARJORIE ELIZABETH THOMAS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | No. 5:15-cv-00122-MTT-CHW |
| | : | |
| **CAROLYN W. COLVIN,** | : | **Social Security Appeal** |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff Marjorie Elizabeth Thomas's application for benefits stemming from a hit in the side by a tractor. 42 U.S.C. § 405(g). Because substantial evidence supports the Commissioner's decision, it is **RECOMMENDED** that the decision be **AFFIRMED**.

## BACKGROUND

### A. Procedural Background

Plaintiff filed an application for a period of disability and disability insurance benefits on October 31, 2011. Tr. 126, 144. The Commissioner denied Plaintiff's claims both initially and upon reconsideration. Tr. 64-68. Plaintiff then requested an administrative hearing. Tr. 72-77. Upon Plaintiff's request, the ALJ held a hearing at which Plaintiff appeared and testified. Tr. 35-58. Following the hearing, the ALJ issued an unfavorable decision finding Plaintiff not disabled and accordingly denied Plaintiff's claims for benefits. Tr. 17-30. Subsequently, Plaintiff requested review from the Appeals Council, which the Appeals Council denied. Tr. 1–3. Plaintiff

then timely filed a complaint with this Court. Doc. 1. The case is now ripe for review under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

### B. Factual Background and the ALJ's Decision

Plaintiff, who was born in 1973, claimed disability beginning on October 31, 2011. Plaintiff has a high school education. Tr. 269. Plaintiff has no relevant past work experience, as none of her previous jobs were within the past 15 years or lasted long enough for her to learn how to do it. Tr. 259; 20 C.F.R. § 404.1560(b)(1). Plaintiff alleged disability due to depression, hip problems, and a ruptured disc in her back. Tr. 39.

In rendering the decision, the ALJ concluded that Plaintiff had not performed substantial gainful activity since October 31, 2011, the alleged onset date. Tr. 22. After conducting a hearing and reviewing the evidence of record, the ALJ determined that Plaintiff had the following severe impairments: lumbar spine degenerative disc disease; osteoarthritis; obesity; dysthymic disorder; depressive disorder; and trichotillomania. Tr. 22. Notwithstanding the noted impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 23. The ALJ then concluded that Plaintiff retained a residual functional capacity ("RFC") to perform light work, with the following exceptions and limitations:

> no climbing of ladders, ropes or scaffolds; no more than occasional climbing of ramps and stairs; no more than occasional kneeling, crouching, or crawling; no more than frequent stooping; and she must avoid concentrated exposure to workplace hazards. In terms of her mental restrictions, the [Plaintiff] is limited to 1, 2, 3-step instructions; no more than occasional contact with supervisors, coworkers and the public; and any workplace changes must be introduced gradually and infrequently.

Tr. 25.

In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that

reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms were not fully credible. Tr. 29. The ALJ further found that Plaintiff had no past relevant work. Tr. 29. However, given Plaintiff's age, education, work experience, and RFC, the vocational expert testified that Plaintiff could perform jobs existing in significant numbers in the national economy, such as a light hand packer, inspector/tester/sorter, and a machine operator. Tr. 30. Accordingly, the ALJ found Plaintiff not disabled. Tr. 30.

### C.  Medical Record

Plaintiff testified that she has suffered from lower back and hip pain and pulling out her hair since being struck by a tractor in 1994. Tr. 40-41; 343. Between 1994 and 2009, Plaintiff's medical record contains various visits to the emergency room for complaints of headaches, earaches, and a hysterectomy in 2006.[1] However, both parties indicate that Plaintiff's first complaint of back pain to primary care provider Dr. William Taunton[2] was in April 2009. Tr. 251. Following the consultation, Plaintiff was assessed with chronic sciatica, gastroesophageal reflux disease (GERD), hypertension, and depression, and was advised to follow up in six weeks. *Id.* At her August 6, 2009 follow-up, Plaintiff was also noted to suffer from heartburn and headaches. Tr. 250. Plaintiff's September 3, 2009 appointment reveals significant progress on

---

[1] Specifically, on March 27, 2000, Plaintiff was admitted for headache and claimed black out spells. Tr. 434. A CT scan of Plaintiff's brain came back normal. Tr. 433. On January 21, 2002, Plaintiff was admitted to the emergency room for headache and nosebleed. Tr. 431-432. Plaintiff was admitted on May 10, 2002, to with complaints of facial pain. Tr. 430. Plaintiff was noted as crying and appearing anxious. *Id.* Plaintiff was admitted for an earache on July 31, 2003 and again on July 5, 2006. Tr. 427. She was admitted on October 31, 2006 for a total abdominal hysterectomy. Tr. 416.

[2] Plaintiff asserts that the ALJ incorrectly referred to Plaintiff's treating physician as Dr. Taumon instead of Taunton due to an illegible signature. Doc. 12, p. 3. This Recommendation notes that either last name is impossible to gather from the signatures present in the record. However, this Court may take judicial notice of Georgia Senate Resolution S.R. 344 filed February 20, 2015 honoring W. Stephen Taunton, MD, medical director of Rock Springs Medical Clinic in Milner, Georgia. See 2015 Georgia Senate Resolution No. 344, Georgia One Hundred Fifty-Third General Assembly - 2015-2016 Regular Session. Thus, this recommendation uses the name Taunton.

Plaintiff's blood pressure (126/77), as well as legible prescriptions for Prozac, trazadone, Pepcid, and Fluoxetine. Tr. 249.

Plaintiff was seen more than a year later by Dr. Taunton in October of 2010 for a refill on her medication. Tr. 404. The medical record reflects the next appointment with Dr. Taunton was thirteen months after that, on November 17, 2011. Tr. 332; 403. At that appointment, Plaintiff complained that her depression was worse, that her medications were not helping, and that she suffered from clinical depression. Plaintiff's physical assessment revealed that her blood pressure was still in check (126/76), and that her lumbar back pain was still present, with her right side hurting worse than the left. Tr. 332; 403. Dr. Taunton continued Plaintiff's medicinal regimen. Also on November 17, 2011,[3] Dr. Taunton completed a Residual Functional Capacity Questionnaire and a mental capacity assessment of Plaintiff. Tr. 253-257.

At the beginning of the RFC Questionnaire, Dr. Taunton noted that he had treated Plaintiff for two years due to lumbar degenerative join disease with a poor prognosis. Tr. 253. He stated that Plaintiff's symptoms of back pain were severe enough to interfere "constantly" with the attention and concentration required to perform simple work related tasks. Tr. 253. Dr. Taunton also noted that Plaintiff's medication affected her capacity to work because it caused drowsiness. Tr. 253. Dr. Taunton opined that Plaintiff would need to recline or lie down during an eight-hour workday in excess of a typical fifteen-minute break in the morning, half to full hour lunch, and a typical fifteen minute break in the afternoon. Tr. 253.

As a result of Plaintiff's impairments, Dr. Taunton found that Plaintiff could walk four blocks without rest or significant pain. Tr. 253. He also found that Plaintiff could sit for 30 minutes, stand, and walk for 30 minutes at one time, but could sit for a total of four hours in an

---

[3] Plaintiff states that Dr. Taunton's RFC Questionnaire was completed on July 17, 2011 (Doc. 12, p. 4), however both the form and the attached cover sheet from Myler Disability clearly note the Questionnaire and Mental Capacity Assessment were completed in November.

eight-hour workday and stand/walk for two hours in an eight-hour workday. Tr. 253.   Dr. Taunton opined that Plaintiff would need a job that allowed her to sit or stand at will (sit/ stand option); and would need to take unscheduled twenty-minute breaks during an eight-hour workday approximately every one and a half to two hours. With regard to her physical limitations, Dr. Taunton stated that in his opinion Plaintiff could only occasionally lift less than 10 pounds and she would likely be absent from work more than four times a month. Tr. 254.

The mental capacity assessment of Plaintiff was conducted on the same day. Tr. 255-257. The results of that assessment found that Plaintiff had slight to moderate limitations in her ability to understand and remember locations and instructions; a slight limitation to perform activities within a schedule, and sustain an ordinary routine; moderate limitations in her ability to carry out very short, as well as detailed instructions, and to maintain attention and concentration for extended periods of time. See Tr. 255. Plaintiff was assessed to have a marked limitation in the ability to complete a normal workday without interruptions from psychologically based symptoms; and Plaintiff was estimated to have three absences a month.  Tr. 256. Additionally Plaintiff was assessed to have moderate limitations in the area of social interaction and adaptation. *Id.*

On December 21, 2011, Plaintiff attended a psychological consultative examination with Dr. McDaniel, Ph.D. See. Tr. 259-261. Plaintiff complained of depression, suicidal ideations, anger issues and stated that she pulled out her own hair. Tr. 259.  Dr. McDaniel observed that the Plaintiff appeared to be expressionless and had a dull facial appearance, that her score on the depression screen reflected severe depression, and that she exhibited low average intelligence. Tr. 260. After a review of her records and his mental health status examination, Dr. McDaniel diagnosed Plaintiff with dysthymic disorder and assessed her Global Assessment of Functioning

at 50. Tr. 261. Dr. McDaniel found that her mental pace and persistence on tasks was good and that she followed moderately complicated instructions, but that a reliable and responsible performance of job related tasks could be "problematic." Tr. 261. He also gave a guarded prognosis for future improvement as she did "not appear to be motivated to improve her life situation." Tr. 261.

On January 4, 2012, Dr. McDaniel's findings were reviewed by Dr. Morgan Kyle, Psy. D. Tr. 262-279. Dr. Kyle agreed that Plaintiff was only moderately limited with regard to the ability to maintain attention and concentration for extended periods and the ability to complete a normal work day. Tr. 263-264. Dr. Kyle also found that Plaintiff's attention and concentration would be variable, but would not be a substantial limitation. Tr. 265.

One week later, on January 11, 2012, Plaintiff was seen by a consultative examiner, Dr. Hutchings. During the evaluation, Plaintiff complained of right hip pain and low back pain that was exacerbated by stooping, bending, squatting, sitting, standing, and walking. Tr. 282. Upon physical examination, Plaintiff was noted to have a normal heart rate and rhythm. Tr. 283. Dr. Hutchings observed that the Plaintiff ambulated more slowly than normal, with an antalgic gait favoring the right leg without an assistive device, that she had a reduction in her lumbar spine range of motion values, and that she exhibited point tenderness at the lumbar sacral junction, with stiffness and pain on all back movements. Tr. 282-84. Dr. Hutchings ordered x-ray scans of her lumbar spine and her hip region that revealed no acute abnormalities, and a mild disc space narrowing at the L4-L5 and the L5-S1 levels with probable facet osteoarthritis also at these levels. Tr. 285. X-rays also found no acute abnormality of the right hip. Tr. 286. He subsequently diagnosed the Plaintiff with symptoms consistent with lumbar spinal stenosis and osteoarthritis of the right hip; trichotillomania; chronic muscle tension headaches; hypertension; and acid

reflux disease. Tr. 284. Dr. Hutchings measured the Plaintiff's weight at 233 pounds, her height at 64 inches tall with a body mass index (BMI) of 40, is consistent with obesity. Tr. 283.

Dr. Hutchings also diagnosed Plaintiff with hypertension and with gastroesophageal reflux disease (GERD). Tr. 284. Plaintiff reported that her hypertension was due to her chronic pain and that she is not treated specifically for it, and also reported that her symptoms of GERD were controlled by taking Zantac. Tr. 282. Dr. Hutchings made the following assessment of Plaintiff's physical impairments:

> [Plaintiff can] perform fine manipulation, perform repetitive· tasks with the hands, stand for 10 to 20 minutes, sit for 5 to 10 minutes before having to shift or get up, sort and handle papers and files, file in a cabinet at or above waist level for short periods, use a keyboard for short periods, tie shoes, button clothes, feed self, handle personal hygiene, walk for 15 minutes, walk without an assistive device. This patient is not able to squat to lift from floor, bend at the waist to lift, push and pull against resistance.

Tr. 284.

As to Plaintiff's mental impairments, Dr. Hutchings noted that Plaintiff had a history of treatment for depression for five years, and reported having trouble sleeping, feelings of worthlessness, poor concentration, and some suicidal thoughts. Tr. 282. His psychological exam revealed the following:

> The patient was alert and oriented to person, place, time and situation. There were no hallucinations or delusions. The thought content was good, judgement was good, and the cognitive skills were appropriate for age and level of education. The affect was labile and the mood was depressed, sad, uneasy and anxious.

Tr. 284. Dr. Hutchings assessed that Plaintiff would be able "to handle simple math, read simple instructions, and perform simple manual tasks," with the above stated impairments. Tr. 284.

On January 13, 2012, Dr. Velvet McDonald, a reviewing physician, found that Plaintiff could perform a range of light work with the limitation of periodically alternating sitting and standing to relieve pain or discomfort. Tr. 294. She also found that Plaintiff could occasional lift

twenty pounds, frequently lift ten pounds, and that her ability to push and pull was unlimited, except for her limitations to lifting and carrying. Tr. 294. Dr. Velvet McDaniel based her opinion on Plaintiff's medical records, treatment history, the findings of Dr. Hutchings' examination and x-rays, Plaintiff's visits to Dr. Taunton, including her single visit in 2010, and the fact that there was "no evidence that she has any injections in her back for the pain or physical therapy or other modalities other than pain med[ication]s." Tr. 294-295.

On March 5, 2012, Dr. Model Neway, another reviewing physician, made similar findings that Plaintiff could perform a range of light work by standing or walking approximately six hours and sitting for six hours in an eight hour work day without the sitting and standing limitation found by Dr. Velvet. Tr. 301-302. Dr. Neway also based his opinion on Plaintiff's medical records, treatment history, the January 2012 findings of Dr. Hutchings' examination, Plaintiff's visits to Dr. Taunton, and the fact that there was "no evidence that she has any injections in her back for the pain or physical therapy or other modalities other than pain med[ication]s." Tr. 302.

Also on March 5, 2012, Plaintiff's records were reviewed by Dr. David A. Williams, Ph.D. Tr. 309-325. Dr. Williams found that Plaintiff's mental impairments caused mild limitations in her activities of daily living, and moderate limitations in maintaining social functioning and maintaining concentration, persistence, and pace. Tr. 319. He found that Plaintiff would benefit from a setting with reduced social demands, but that it was not a substantial limitation. Tr. 325.

On August 20, 2012, Dr. Foster B. Brin, M.D. along with other staff members evaluated Plaintiff's depression at River Edge Behavioral Health. Tr. 334-400.  In the initial screening

portion of the assessment,[4] Plaintiff answered questions indicating that she: (1) had episodes in which she heard voices and suffered from visual hallucinations; (2) suffered anxiety and as a result she had difficulty concentrating and making decisions; and (3) had thoughts about killing herself[5]. Tr. 338. Plaintiff also said that she had strong fears, believed that some group might be trying to influence her behavior, and explained that she had attacks of anxiety, and was uneasy. Tr. 338-339. The evaluator, Ayeva S. Johnson Golden L.A.P.C., in her initial summary noted that Plaintiff was referred to River Edge by her lawyer, has experienced hallucinations since 1998, has had suicidal thoughts since the death of her father in 2007, and has suffered stress related to the recent death of her cat. Tr. 343. She further noted that Plaintiff was coherent and able to follow the flow of the examination. Tr. 344. The evaluator concluded that Plaintiff was at a serious risk of harming herself or others and recommended further evaluation as well as group therapy to learn coping skills. Tr. 334-351.

Following a consultation later that day with Dr. Foster,[6] Plaintiff was diagnosed with recurring, severe major depressive disorder with psychotic features; acute stress disorder; andtrichotillomania. Tr. 372-73. Her GAF was assessed at 40—in the serious range of psychological symptoms. *Id*. Plaintiff was placed in a rehab facility for twenty-three hours at the recommendation of Dr. Foster. Tr. 372. Dr. Foster noted Plaintiff's other general medical conditions as well: GERD and sleep apnea. Tr. 373. The Plaintiff was treated with prescribed psychotropic medications, along with a recommendation for group therapy counseling. Tr. 383-

---

[4] Plaintiff's characterized her initial screening responses as "treatment notes" in her brief (See Doc. 12, p. 4) however, a review of the full assessment reveals that these were simply screening questions. See Tr. 338.

[5] Plaintiff's statement of the medical records affirms that "Plaintiff explained that she often felt like killing herself," however the question to which Plaintiff answered in the affirmative reads as follows: "have you ever been depressed weeks at a time? Lost interest or pleasure in most activities, had trouble concentrating and making decision, or thoughts about killing yourself." Compare Doc. 12, p. 4 with Tr. 338.

[6] Later that same day Plaintiff denied having suicidal thoughts or intentions or hurting others. Tr. 379.

385. Plaintiff later testified that the one night she spent under observation at River Edge was due to a misunderstanding by the nurse. Tr. 44-45.

On October 3, 2012, Plaintiff was again treated at River Edge Behavioral Health. Tr. 389-391. A physical examination showed Plaintiff's blood pressure at 159/93. Tr. 391. Plaintiff reported continued depression at a 6/10 and anxiety at 0/10; as well as difficulty sleeping evidenced by getting "up and down during the night." Tr. 393.

Late in the evening on October 8, 2012, Plaintiff was taken to the Medical Center of Central Georgia by ambulance for episodes of chest pain. Tr. 407. Tr. 407. Her symptoms included "tightness, pressure, sharp and stabbing" pain. *Id.* Plaintiff stated that her pain increased with exertion, movement, and breathing, but was relieved with rest.[7] Plaintiff was treated with Nitroglycerin. Plaintiff also experienced shortness of breath, nausea, and anxiety. Tr. 407. Plaintiff's differential diagnosis presented an unstable angina, anxiety, and atypical chest pain. Tr. 408. An electrocardiogram revealed normal sinus rhythm with "borderline T abnormalities." Tr. 408; 411. Plaintiff was discharged a little over an hour later. Tr. 410.

On January 10, 2013, Plaintiff was treated at River Edge Behavioral Health, where she reported that she was having the "shakes" from trazodone, and stopped taking the medication. Tr. 461. Plaintiff denied depression, denied suicidal or homicidal thoughts, slept "fairly well" with "fair energy," had a "good appetite" and was taking Prozac from her general doctor. Tr. 461.

On the afternoon of April 5, 2013, Plaintiff was treated again at River Edge Behavioral Health, where she reported headaches every day with a sensitivity to light and sounds. Tr. 438. The physician observed that Plaintiff was depressed, but she sustained eye contact and was

---

[7] Plaintiff told medical officials that the onset of pain started at 5:00 p.m. that afternoon with increased left-sided check pain, "increasing in magnitude" at 8:00 pm when she learned her boyfriend was breaking up with her. Tr. 407.

responsive. Plaintiff reported that she had been out of Wellbutrin for a month and was feeling, "like I don't want to do anything." Plaintiff also reported irritability and anger. Plaintiff also reported that small places or having people around her, sitting too close increased her anxiety. Plaintiff continued to experience Trichotiliomania and pulled her hair out every day. Tr. 438. The physician also observed that Plaintiff's thoughts were racing. Tr. 438. She was still sad, her mood was depressed, and she alleged that she slept restlessly with low energy and excess appetite. Tr. 445. Plaintiff continued with medicinal regimen but declined other services. Tr. 438.

## APPLICABLE STANDARDS

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

## ANALYSIS

Plaintiff does not challenge the ALJ's determinations at Steps One through Three of the evaluation process. Instead, Plaintiff argues that the Administrative Law Judge's decision did not properly evaluate and assess Plaintiff's case solely at Steps Four and Five. Plaintiff brings the following issues on appeal:

1.  Whether the ALJ erred in failing to provide good cause for rejecting the opinion of Plaintiff's treating physician.

2.  Whether the ALJ improperly analyzed Plaintiff's credibility.

3.  Whether the ALJ erred by improperly relying on the testimony of a vocational expert in finding that Plaintiff is capable of performing a full range of light work.

For the below stated reasons, the Commissioner's decision is supported by substantial evidence, and should be affirmed.

**Plaintiff's RFC Determination**

Plaintiff's arguments address the ALJ's findings at Steps Four and Five of the sequential evaluation process: the RFC Determination and Jobs in the National Economy.

A Plaintiff's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The determination of the RFC is an administrative assessment based on all the evidence of how Plaintiff's impairments and related symptoms affect her ability to perform work-related activities. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The regulations state that the final responsibility for assessing a claimant's RFC rests with the ALJ, based on all the evidence in the record. See 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a)(3), 404.1546(c), 416.927(e)(2), 416.945(a)(3), 416.946(c). Relevant evidence includes medical reports from treating and examining sources, medical assessments, and descriptions and observations of a claimant's limitations by the claimant, family, neighbors, friends, or other persons. See 20 C.F.R. §§ 404.1545(a)(3), 416.945(a) (3).

When deciding the evidence: "the testimony of a treating physician must be given substantial or considerable weight unless good cause is shown to the contrary." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (citations and internal quotations omitted). The ALJ may discount the treating physician's report where it is not accompanied by objective medical evidence, is wholly conclusory, or is contradicted by the physician's own record or other objective medical evidence. *Id.*; *see also Green v. Social Sec. Admin.*, 223 Fed. Appx. 915, 922–23 (11th Cir. 2007) (ALJ had good cause to devalue a treating physician's opinion where it was inconsistent with the objective medical evidence, as well as plaintiff's testimony). The Eleventh Circuit has enumerated factors the ALJ must consider when declined to give the treating physician's opinion controlling weight:

> When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the: (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence and explanation supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the pertinent medical issues; and (6) other factors that tend to support or contradict the opinion.

*Weekley v. Commissioner of Soc. Sec.*, 486 Fed. App'x. 806, 808 (11th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)). Further, when an ALJ articulates specific reasons for declining to give a treating physician's opinion controlling weight, and the reasons are supported by substantial evidence, there is no reversible error. *See Forrester v. Commissioner of Social Sec.*, 455 Fed. App'x. 899, 902 (11th Cir. 2012) ("We have held that an ALJ does not need to give a treating physician's opinion considerable weight if evidence of the [Plaintiff]'s daily activities contradicts the opinion."). Indeed, an ALJ "may reject any medical opinion, if the evidence supports a contrary finding." *Id.* at 901.

Further, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants ... may be entitled to greater weight than the opinions of treating or examining sources." SSR 96–6p. The weight given to a non-examining consultant's opinion depends on "the extent to which it is supported by clinical findings and is consistent with other evidence." *Jarrett v. Comm'r of Soc. Sec.*, 422 Fed. App'x. 869, 873 (11th Cir. 2011); see also *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004).

The Court must also be aware that some opinions, such as whether a plaintiff is disabled, the plaintiff's residual functional capacity, and the application of vocational factors "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). The Court is

interested in the doctors' evaluations of the plaintiff's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Such statements by a physician are relevant to the ALJ's findings, but they are not determinative, as it is the ALJ who bears the responsibility for assessing a plaintiff's residual functional capacity. See, e.g., 20 C.F.R. § 404.1546(c).

In formulating Plaintiff's RFC, the ALJ analyzed the record as a whole, including Plaintiff's treating physician Dr. Taunton, consultative physician Dr. Hutchings, consultative physician Dr. McDaniel, the State Agency reviewers, and the testimony of Plaintiff and her mother. Tr. 25–29. The ALJ organized his opinion to address Plaintiff's physical impairments first and her mental impairments second. As stated above, the ALJ considered Plaintiff's testimony, but did not find it wholly credible. Tr. 26. The ALJ then turned to the medical record and accorded greater weight to the opinions of the state agency reviewing physicians than the opinions of Dr. Taunton and Dr. Hutchings. Plaintiff's arguments address the ALJ's treatment of both Plaintiff's treating physician, as well as her own testimony.

1. Physical Impairments

Starting with her visit in April of 2009, Plaintiff saw Dr. Taunton several times, ending with an appointment and disability assessment on November 17, 2011.

In the assessment, Dr. Taunton completed a Residual Functional Capacity Questionnaire noting that he had treated Plaintiff for two years due to lumbar degenerative join disease with a poor prognosis. Tr. 253. Dr. Taunton stated that Plaintiff's symptoms of back pain were severe enough to interfere "constantly" with the attention and concentration required to perform simple work related tasks. Tr. 253. Dr. Taunton also noted that Plaintiff's medication affected her capacity to work because it caused drowsiness. Tr. 253. Dr. Taunton opined that Plaintiff would

need to recline or lie down during an eight-hour workday in excess of a typical fifteen-minute break in the morning, half to full hour lunch, and a typical fifteen minute break in the afternoon. Tr. 253.

As a result of Plaintiff's impairments, Dr. Taunton found that Plaintiff could walk four blocks without rest or significant pain. Tr. 253. He also found that Plaintiff could sit for 30 minutes, stand, and walk for 30 minutes at one time, but could sit for a total of four hours in an eight-hour workday and stand/walk for two hours in an eight-hour workday. Tr. 253. Dr. Taunton opined that Plaintiff would need a job that allowed her to sit or stand at will (sit/ stand option); and would need to take unscheduled twenty-minute breaks during an eight-hour workday approximately every one and a half to two hours. In regards to her physical limitations, Dr. Taunton stated that in his opinion Plaintiff could only occasionally lift less than 10 pounds and she would likely be absent from work more than four times a month. Tr. 254.

The ALJ gave Dr. Taunton's opinions of Plaintiff's RFC limitations "little weight" in his determination of Plaintiff's RFC. The ALJ's reasons for giving less weight to Dr. Taunton's assessment of physical limitations were for good cause and supported by substantial evidence. The ALJ noted that although Dr. Taunton was Plaintiff's treating physician for two years, "his treatment notes regarding his observations are very brief, handwritten, and barely legible." Tr. 26. The ALJ further stated that "the record is bereft of any referrals to a specialist, any diagnostic testing, any physical therapy or any other forms of treatment." Tr. 26. He concludes: "[c]onsidering the lack of any specialized treatment history for her back pain; the absence of any MRI scans, CT scans, electromyograms or nerve conduction velocity studies; as well as the [Plaintiff]'s sporadic presentations to Dr. Taunton" Taunton's assessment was entitled to "little weight." Tr. 26.

Moreover, substantial evidence supports the ALJ's decision to accord "little weight" to the opinion of Dr. Taunton. Contrary to Dr. Taunton's assessment, Plaintiff's x-rays on January 11, 2012 of her lumbar spine and her hip region revealed no acute abnormalities, and only mild disc space narrowing at the L4-L5 and the L5-S1 levels with probable facet osteoarthritis also at these levels. Tr. 285. X-rays also revealed no acute abnormality of the right hip. Tr. 286. A review of Dr. Taunton's assessment shows that while he found significant limitations from Plaintiff's impairments, he provides little to no support for his findings. See Tr. 253-254. Indeed, while Dr. Taunton indicated in his assessment that he treated Plaintiff for two years, Plaintiff only saw him five times within that two year period, with three appointments in 2009, one appointment in 2010, and one appointment in 2011. See Tr. 247-252. Dr. Taunton does not indicate that he is an orthopedic specialist, lending more support to the ALJ's decision to give Dr. Taunton's opinion less weight with regard to her physical impairments.

Dr. Taunton's opinion is not consistent with other medical evidence in the record. Health care professionals at River Edge Behavioral Health ("River Edge") noted that Plaintiff walked with a normal gait and showed muscle strength and tone within normal limits. Tr. 445. Further, the opinions of both reviewing physicians, Dr. Model Neway and Dr. Velvet McDonald, found that Plaintiff could perform a range of light work by standing or walking approximately six hours and sitting for six hours in an eight hour work day. See Tr. 294-300; 301-308. Thus, the ALJ provided good cause for giving "little weight" to Dr. Taunton's opinion and the Court should uphold the ALJ's determination on appeal because the decision is supported by substantial evidence.

2. Mental Impairments

During his disability assessment on November 17, 2011, Dr. Taunton also conducted a mental capacity assessment of Plaintiff. Tr. 255-257. In his assessment he noted that Plaintiff had slight to moderate limitations in her ability to understand and remember locations and instructions; a slight limitation to perform activities within a schedule, and sustain an ordinary routine; moderate limitations in her ability to carry out very short, as well as detailed instructions, and to maintain attention and concentration for extended periods of time. See Tr. 255. Plaintiff was assessed to have a marked limitation in the ability to complete a normal workday without interruptions from psychologically based symptoms, and was estimated to have three absences a month.   Tr. 256. Additionally Plaintiff was assessed to have moderate limitations in the area of social interaction and adaptation. *Id.*

The ALJ gave Dr. Taunton's opinions of Plaintiff's psychological issues "some weight" in his determination of Plaintiff's RFC. Tr. 28. The ALJ's reasons for giving some weight to Dr. Taunton as to her mental limitations were for good cause and supported by substantial evidence. The ALJ noted that Dr. Taunton's "treatment notes did not reflect any significant observations, there is nothing in the record to indicate that she would miss three days per month, and his opinion is not fully consistent with the record as a whole. Furthermore, as her primary care provider, he is not a specialized mental health professional." Tr. 28. Dr. Taunton's assessment was thus appropriately entitled to "some weight."

Other substantial evidence supports the ALJ's decision to accord "some weight" to the opinion of Dr. Taunton regarding Plaintiff's mental impairments. Contrary to the "marked" limitations Dr. Taunton indicated, the ALJ noted Dr. Taunton provided only sporadic, conservative, primary care to Plaintiff. Tr. 28, 255-56. Plaintiff had never been hospitalized for

depression. Tr. 42, 338. Although Dr. Taunton prescribed Prozac to Plaintiff, there is no documentation of any significant observations regarding Plaintiff's mental functioning and he never referred Plaintiff to a mental health specialist. Notably absent from Taunton's mental evaluation is any description of "supporting medical/clinical findings;" instead the assessment shows those fields were left blank. Tr. 255-257.

Instead, the ALJ considered the opinions of Dr. McDaniel, a consultative psychologist. Tr. 28; 259-261. After a review of Plaintiff's records and mental health status examination, Dr. McDaniel diagnosed the Plaintiff with dysthymic disorder and assessed her Global Assessment of Functioning at 50. Tr. 261. Dr. McDaniel found that Plaintiff's mental pace and persistence on tasks was good and that she followed moderately complicated instructions, but that a reliable and responsible performance of job related tasks could "problematic." Tr. 261.

Plaintiff also went to River Edge Behavioral Health at the referral of her lawyer. Tr. 343. Mental status examinations at River Edge revealed Plaintiff often presented as depressed but was able to maintain concentration and had grossly intact memory, coherent thought processes, and normal thought content.  Tr. 371, 397, 446, 462. During her initial assessment, Ayeva S. Johnson Golden L.A.P.C., noted that Plaintiff was coherent and able to follow the flow of the examination. Tr. 344. Accordingly, substantial evidence supports the ALJ's decision to accord greater weight to the opinions of the reviewing and examining physicians than to Dr. Taunton's opinion.

## Whether the ALJ improperly discredited Plaintiff's credibility

Plaintiff argues that the ALJ's reasoning was insufficient to discredit Plaintiff's testimony. Doc. 12 p. 16. Substantial evidence supports the ALJ's finding that Plaintiff's statements

concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely credible." Doc. 13, p. 13.

The Eleventh Circuit's three-part pain standard that applies whenever a plaintiff asserts disability through testimony of pain or other subjective symptoms requires (1) evidence of an underlying medical condition and either (2) objective medical evidence confirming the severity of the alleged pain arising from that condition, or (3) that the objectively determined medical condition is of such a severity that it can be reasonably be expected to cause the alleged pain. *Foote v. Charter*, 67 F.3d 1553, 1560 (11th Cir. 1995); *Kelly v. Apfel*, 185 F.3d 1211, 1215 (11th Cir. 1999). After considering Plaintiff's subjective complaints, the ALJ may reject them as not credible, and that determination is reviewed for substantial evidence. *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992). If the objective medical evidence does not confirm the severity of the alleged symptoms, but indicates that the plaintiff's impairment could reasonably be expected to produce some degree of pain and other symptoms, the ALJ evaluates the intensity and persistence of the plaintiff's symptoms and their effect on her ability to work by considering the objective medical evidence, the plaintiff's daily activities, treatment and medications received, and other factors concerning functional limitations and restrictions due to pain. See 20 C.F.R. § 404.1529.

Plaintiff testified at the administrative hearing that she experiences severe back pain, which hurts from the middle of her back down through her lower back. Tr. 39. She also mentioned problems with her hip, but she admitted receiving no treatment regarding her hip except medicine. Tr. 40-41. She stated that she receives treatments "every three months" at River Edge, receiving medication for anxiety and depression, which seems to help. Tr. 41.

Plaintiff testified that she last worked in 2000 but had to quit because her back hurt too much. Tr. 41. She alleged that she is only able to lift and carry about five pounds, can stand and walk for five minutes, and is only able to sit for about ten before having to move around. Tr. 42. She states that she has never been hospitalized for depression. Tr. 42. Plaintiff stated that she can read and write, but doesn't "understand what [she] read[s]." Tr. 43. Plaintiff stated that she has crying spells "every once in a while." Tr. 51. Plaintiff credits the crying to both her depression and back pain. Tr. 51. Plaintiff stated that she does not like to be around people, but prefers to stay in her room most of day. Tr. 52. Plaintiff sleeps thirty minutes to an hour a night, for a total of two to three hours during an entire day. Tr. 52, 53.

As to her activities of daily living, Plaintiff testified that she lived with her mother, who was fifty-nine. Plaintiff drives herself but has trouble shopping because she has to stop and rest so often. Tr. 47-49. Plaintiff testified that she cannot complete household chores because of her back, nor can she assist in outside work at home. Tr. 49. Plaintiff can shower by herself, but not for too long. Tr. 53. She also testified that she has trouble cleaning herself after she uses the bathroom, "off and on." Tr. 53.

In his decision, the ALJ noted that while Plaintiff's description of her symptoms as presented were significantly limiting, the Plaintiff's medical record diminishes the credibility of her allegations of being totally disabled. The ALJ did not err in his treatment of Plaintiff's subjective complaints.

The ALJ explained his reasoning for discounting Plaintiff's subjective complaints, which mirror the reasons he rejected the opinions of Dr. Taunton. In particular, the ALJ found Plaintiff's allegations regarding her physical limitations were not credible because Plaintiff's "sporadic presentations" to her primary care physician did not support allegations of extreme

pain. Indeed, as noted several times in this Recommendation, Plaintiff went to Dr. Taunton only once in 2010. The ALJ also noted that Plaintiff failed to pursue any specialized treatment, physical therapy, or other forms of treatment for her back pain. Tr. 26.  Plaintiff reported on her disability application and appeal that she took only Naproxen for pain.  Tr. 167, 187, 234.  See *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (finding types and dosages of medications such as Motrin, Tylenol, and Darvocet, and even one-time use of Lortab, was inconsistent with complaints of disabling pain). The ALJ also looked at the objective evidence presented in Plaintiff's x-rays, which showed only mild findings, and discredited the extent of Plaintiff's alleged back and hip pain.  Tr. 26, 285.

Regarding Plaintiff's mental limitations, the ALJ found Plaintiff not credible due to the notable absence of any referrals from a doctor for professional mental health treatment, the brief period of professional mental health treatment at River Edge, the lack of psychiatric hospitalizations, the deficient notes of Dr. Taunton that show no mental health status examinations, and the results of Plaintiff's most recent mental health status examinations. Tr. 27-28, 282, 331-32, 438-40. As discussed above in addressing Dr. Taunton's opinions, each of these reasons is supported by substantial evidence.

The ALJ states "one would expect that with symptoms this severe, there would have been extensive professional treatment, in addition to possible hospitalization." Tr. 27. Records from Plaintiff's only professional mental treatment, however, show that she did not arrive until August 2012, nearly a year after her alleged onset date. Further, Plaintiff herself testified that her overnight observation at the facility was the result of a misunderstanding, as she had misstated a real threat of harm to herself. Tr. 44-45.

Although Dr. Taunton prescribed Plaintiff Prozac for her depression, he provides little to no reasoning supporting this decision or his diagnosis. Tr. 249-256. Instead, the ALJ looked to the diagnosis of Dr. McDaniel, who observed that Plaintiff was more "dysthymic than she was depressed." Tr. 28; 261. See *Wind v. Barnhart*, 133 F. App'x 684, 686 (11th Cir. 2005) (defining dysthymic disorder as a chronic disturbance of mood characterized by mild depression or loss of interest in usual activities).

It is also important to note that the ALJ did not totally discount Plaintiff's testimony. The ALJ recognized that the Plaintiff "has some psychological issues" but he did "not believe that her mental health treatment record as described above" supported the level of severity the Plaintiff alleged. Tr. 28. A review of both his decision and the medical record shows that the ALJ followed the appropriate three-step method in determining Plaintiff's credibility regarding her subjective symptoms. Thus the Commissioner must be affirmed on this ground.

**Whether the ALJ erred by improperly relying on the testimony of a vocational expert in finding that Plaintiff is capable of performing a full range of light work.**

Plaintiff also argues that the ALJ erred at the fifth step of the sequential evaluation process.

If a claimant establishes that she is unable to perform her past relevant work, the Commissioner must show, at step five, that the claimant—in light of her RFC, age, education, and work experience—is capable of performing other work that exists in substantial numbers in the national economy. *Reynolds-Buckley*, 457 Fed. App'x. at 863; see also 20 C.F.R. § 404.1520(c)(1). To make this determination, the ALJ may either apply the Medical-Vocational Guidelines ("Grids") or consult a vocational expert. See *Phillips v. Barnhart*, 357 F.3d 1232, 1239–40 (11th Cir. 2004). However, the ALJ may not exclusively rely on the Grids, and must

consult a vocational expert, if the claimant is unable to perform a full range of work at a given residual functional level or if the claimant has non-exertional impairments that significantly limit basic work skills. *Id*. at 1242– 43.

The Grids "consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Heckler v. Campbell*, 461 U.S. 458, 461–62 (1983). When a claimant's circumstances correspond to the factors identified by a rule in the Grids, the Grids direct a conclusion as to whether the claimant is or is not disabled. *Id*. at 462; 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 200.00(a). However, the rules must only be applied "when they describe a claimant's abilities and limitations accurately." *Heckler*, 461 U.S. at 462 n.5. A mechanical application of the Grids is inappropriate if a claimant's capabilities are not described accurately by a rule or if a claimant possesses limitations that are not accounted for in the Grids. *Id*.

The ALJ appropriately concluded that the Medical-Vocational Guidelines did not direct a decision as to Plaintiff's disability. Tr. 29. He specifically found that "the [plaintiff]'s ability to perform all or substantially all of the requirements of [light] work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, [the Administrative Law Judge] asked the vocational expert whether jobs exist in the national economy for an individual with the [plaintiff]'s age, education, work experience, and residual functional capacity." Tr. 30.

The ALJ found that Plaintiff, who was born in 1973, was a "younger individual" on the date the application was filed, and that she had at least a high school education and could communicate in English. Tr. 29. In answering hypothetical questions from the ALJ, the VE

testified that an individual with Plaintiff's RFC and vocational factors could perform the jobs of light hand packer, inspector/tester/sorter, and machine operator, and these jobs existed in significant numbers in the national economy. Tr. 30. Based on this testimony, the ALJ found Plaintiff could perform other work. Tr. 30.

Plaintiff argues that the ALJ erred by failing to include all of Plaintiff's impairments when the ALJ posed a hypothetical question to the vocational expert. Doc. 12 p. 18. Specifically, Plaintiff contends the ALJ erred by failing to include the impairments opined by Dr. Taunton and the limitations claimed by Plaintiff.

If the ALJ decides to use a vocational expert, for the vocational expert's opinion to constitute substantial evidence, "the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). Here, the ALJ's hypothetical question to the ALJ comprised all the limitations found by the ALJ in his RFC determination. Because the ALJ's RFC finding was supported by substantial evidence, the ALJ did not err by relying on the testimony of the vocational expert. As explained above, the ALJ did not err in discounting the opinion of Dr. Taunton and the testimony of Plaintiff. The ALJ committed no error in relying on the vocational expert's testimony. Accordingly, the Court should affirm the ALJ's decision.

## CONCLUSION

After a careful consideration of the record, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**. Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, WITHIN FOURTEEN (14) DAYS after being served with a copy thereof. The District Judge shall make a de novo determination of those portions of the Recommendation to

which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO RECOMMENDED**, this 1st day of April, 2016.

s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge